Slip-Op. 18-80

**UNITED STATES COURT OF INTERNATIONAL TRADE**

HYUNDAI STEEL COMPANY,

               Plaintiff,

    v.

UNITED STATES,

               Defendant,

   and

AK STEEL CORPORATION, STEEL
DYNAMICS, INC., ARCELORMITTAL
USA LLC, NUCOR CORPORATION,
UNITED STATES STEEL
CORPORATION,

               Defendant-Intervenors.

Before: Mark A. Barnett, Judge
Court No. 16-00228

**PUBLIC VERSION**

<u>**OPINION AND ORDER**</u>

[Granting in part and denying in part Plaintiff Hyundai Steel Company's motion for judgment upon the agency record.]

Dated: June 28, 2018

<u>Henry D. Almond</u> and <u>Daniel R. Wilson,</u> Arnold & Porter Kaye Scholer LLP, of Washington, DC, argued for Plaintiff.  With them on the brief were <u>J. David Park</u> and <u>Sylvia Y. Chen.</u>

<u>Renée A. Burbank</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant.  With her on the brief were <u>Chad A. Readler</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Patricia M. McCarthy</u>, Assistant Director.  Of counsel on the brief was <u>Nanda Srikantaiah</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Grace W. Kim, Kelley Drye & Warren LLP, of Washington, DC, argued for Defendant-Intervenor ArcelorMittal LLC.  With her on the brief were Paul C. Rosenthal, R. Alan Luberda, Kathleen W. Cannon, and Joshua R. Morey.

Stephen A. Jones and Daniel L. Schneiderman, King & Spalding, LLP, of Washington, DC, for Defendant-Intervenor AK Steel Corporation.

Roger B. Schagrin and Christopher T. Cloutier, Schagrin Associates, of Washington, DC, for Defendant-Intervenor Steel Dynamics, Inc.

Alan H. Price, Timothy C. Brightbill, and Chris B. Weld, Wiley Rein LLP, of Washington, DC, for Defendant-Intervenor Nucor Corporation.

Thomas M. Beline and Sarah E. Shulman, Cassidy Levy Kent (USA) LLP, of Washington, DC, for Defendant-Intervenor United States Steel Corporation.  With them on the brief were Jeffrey D. Gerrish, Nathaniel B. Bolin, and Luke A. Meisner, Skadden Arps Slate Meagher & Flom, LLP, of Washington, DC.

Barnett, Judge: Plaintiff Hyundai Steel Company ("Plaintiff" or "Hyundai Steel") moves, pursuant to United States Court of International Trade ("USCIT") Rule 56.2, for judgment on the agency record, challenging the final determination of the U.S. Department of Commerce ("Commerce" or the "agency") in its antidumping duty investigation of certain cold-rolled steel flat products ("cold-rolled steel") from the Republic of Korea ("Korea").  *See Certain Cold-Rolled Steel Flat Products From the Republic of Korea*, 81 Fed. Reg. 49,953 (Dep't Commerce July 29, 2016) (final determination of sales at less than fair value) ("*Final Determination*"), ECF No. 39-3, and the accompanying Issues and Decision Mem., A-580-881 (July 20, 2016) ("I&D Mem."), ECF No. 39-2.[1]

---

[1]  The administrative record is divided into a Public Administrative Record ("PR"), ECF No. 39-5, and a Confidential Administrative Record ("CR"), ECF No. 39-4.  Parties submitted joint appendices containing record documents cited in their briefs. *See* Public Joint App. ("PJA"), ECF No. 58; Confidential Joint App. ("CJA"), ECF No. 57; Suppl. Public Joint App. ("Suppl. PJA"), ECF No. 66; Suppl. Confidential Joint App. ("Suppl. CJA"), ECF No. 65.   The court references the confidential versions of the relevant record documents, if applicable, throughout this opinion, unless otherwise specified.

Plaintiff, a Korean producer and exporter of cold-rolled-steel, challenges

Commerce's determination to: (1) use the facts available with an adverse inference

(referred to as "adverse facts available" or "AFA") in adjusting Hyundai Steel's reported

expenses concerning freight and warehousing transactions with affiliated companies;

(2) use AFA in connection with some of Hyundai Steel's reported control number

("CONNUM") data; and (3) deny Hyundai Steel a constructed export price ("CEP")

offset.  Confidential Mem. in Supp. of Pl. Hyundai Steel Co.'s Rule 56.2 Mot. for J. on

the Agency R. ("Pl.'s Br.") at 1, ECF No. 47.  Defendant United States ("Defendant" or

the "Government") and Defendant Intervenors—AK Steel Corporation, ArcelorMittal

USA LLC, Nucor Corporation, Steel Dynamics, Inc., and United States Steel

Corporation—support the *Final Determination*.  *See generally* Confidential Def.'s Resp.

to Pl.'s Mot. for J. Upon the Agency R. ("Gov.'s Resp."), ECF No. 50; Confidential Def.-

Ints.' Joint Resp. in Opp'n to Pl.'s Mot. for J. on the Agency R. ("Def.-Ints.' Resp."), ECF

No. 53.  For the reasons discussed below, the court grants, in part, Plaintiff's motion.

## BACKGROUND

## I.   Legal Framework

### A.  Basic Antidumping Principles

Commerce imposes an antidumping duty on foreign merchandise that "is being,

or is likely to be, sold in the United States at less than its fair value," and results in

material injury or threat of material injury to a U.S. domestic industry.  19 U.S.C. § 1673

(2012).[2]  The antidumping duty imposed is "an amount equal to the amount by which

---

[2] Citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and all references to the United States Code are to the 2012 edition.  Citations to 19 U.S.C. § 1677e, however, are to the United States Code 2016 edition, which reflects

the normal value exceeds the export price (or the constructed export price) for the

merchandise." *Id.* Accordingly, antidumping analysis requires Commerce to compare

the export price or constructed export price of the subject merchandise with the normal

value of the foreign like product. *Id.* § 1677b(a) (Commerce must make "a fair

comparison . . . between the export price or constructed export price and normal value"

of the subject merchandise); *see also* 19 C.F.R. § 351.401(a). Normal value typically is

"the price at which the foreign like product is first sold . . . for consumption in the

exporting country, in the usual commercial quantities and in the ordinary course of trade

and, to the extent practicable, at the same level of trade as the export price or

constructed export price." 19 U.S.C. § 1677b(a)(1)(B)(i). In this case, "normal value"

refers to the price of cold-rolled steel sold in Korea. Constructed export price is "the

price at which the subject merchandise is first sold . . . in the United States . . . by or for

the account of the producer or exporter . . . or by a seller affiliated with the producer or

exporter," to an unaffiliated purchaser. 19 U.S.C. § 1677a(b).

To achieve a fair comparison between the export price (or constructed export

price) and normal value, "Commerce seeks to ensure that a producer's costs are

reflective of the market value of those goods or services, and may adjust both values."

*Hyundai Steel Co. v. United States*, 41 CIT __, 279 F. Supp. 3d 1349, 1354 (2017).

When companies use affiliated providers for certain services, the prices paid to the

---

amendments to § 1677e pursuant to the Trade Preferences Extension Act
("TPEA"), Pub. L. No. 114–27, § 502, 129 Stat. 362, 383–84 (2015). The TPEA
amendments affect all antidumping determinations made on or after August 6, 2015,
and, therefore, apply to the instant proceeding. *See Dates of Application of
Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade
Preferences Extension Act of 2015*, 80 Fed. Reg. 46,793 (Dep't Commerce Aug. 6,
2015).

affiliated providers may not reflect the market price for those services.   *See id.* at 1354-

55.  Therefore, Commerce "determine[s] whether the transactions with the affiliated

company were made at arm's-length, or comparable to transactions conducted with an

unaffiliated party."  *Id.* at 1355.

### B.  Facts Available and Adverse Facts Available

When "necessary information is not available on the record," or an interested

party "withholds information" requested by Commerce," "fails to provide" requested

information by the submission deadlines, "significantly impedes a proceeding," or

provides information that cannot be verified pursuant to 19 U.S.C. § 1677m(i),

Commerce "shall . . . use the facts otherwise available."  19 U.S.C. § 1677e(a).[3]

Additionally, if Commerce determines that the party "has failed to cooperate by not

acting to the best of its ability to comply with a request for information," it "may use an

inference that is adverse to the interests of that party in selecting from among the facts

otherwise available." *Id.* § 1677e(b).  "Compliance with the 'best of its ability' standard is

determined by assessing whether a respondent has put forth its maximum effort to

provide Commerce with full and complete answers to all inquiries in an investigation."

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).[4]  Before

using adverse facts available, Commerce "must make an objective showing that a

reasonable and responsible importer would have known that the requested information

---

[3] As discussed *infra*, Commerce's authority to use the facts otherwise available is
subject to 19 U.S.C. § 1677m(d). *See* 19 U.S.C. § 1677e(a).  Section 1677m(d)
provides the procedures Commerce must follow when a party files a deficient
submission. *See id.* § 1677m(d).
[4] *Nippon Steel* predates the TPEA. However, the relevant statutory language discussed
in that case remains unchanged. *Compare* 19 U.S.C. § 1677e(b)(2012), *with* 19 U.S.C.
§ 1677e(b)(1)(2016).

was required to be kept and maintained under the applicable statutes, rules, and

regulations." *Id.* at 1382. Next, Commerce

> must [ ] make a subjective showing that the respondent['s] ... failure to fully
> respond is the result of the respondent's lack of cooperation in either: (a)
> failing to keep and maintain all required records, or (b) failing to put forth
> its maximum efforts to investigate and obtain the requested information
> from its records.

*Id.* at 1382–83.  "An adverse inference may not be drawn merely from a failure to

respond." *Id.* at 1383.  Rather, Commerce may apply an adverse inference "under

circumstances in which it is reasonable for Commerce to expect that more forthcoming

responses should have been made." *Id.*

When applying an adverse inference, Commerce may rely on information derived

from the petition, a final determination in the investigation, a previous administrative

review, or any other information placed on the record.  19 U.S.C. § 1677e(b)(2); 19

C.F.R. § 351.308(c)(2015).  When Commerce "relies on secondary information rather

than on information obtained in the course of an investigation or review, [Commerce] . .

. shall, to the extent practicable, corroborate that information from independent sources

that are reasonably at [its] disposal."  19 U.S.C. § 1677e(c)(1).  Pursuant to agency

regulations, corroboration means that Commerce "will examine whether the secondary

information to be used has probative value."  19 C.F.R. § 351.308(d).  However, if it is

not practicable to do so, Commerce may still "apply[] an adverse inference as

appropriate and us[e] the secondary information in question."  *Id.*  When Commerce

uses primary information (obtained in the course of the investigation or review), rather

than secondary information, to select from among the adverse facts available, the

statute does not require corroboration.  *See Nan Ya Plastics Corp. v. United States*, 810

F.3d 1333, 1348-49 (Fed. Cir. 2016).

### C.  CEP Offset

Commerce must establish normal value "to the extent practicable, at the same

level of trade as the export price or constructed export price."  19 U.S.C.

§ 1677b(a)(1)(B)(i).  The Federal Circuit has construed the term "same level of trade" to

mean "comparable marketing stages in the home and United States markets."  *Micron*

*Tech., Inc. v. United States*, 243 F.3d 1301, 1305 (Fed. Cir. 2001).  When Commerce is

unable to find sales in the foreign market at the same level of trade as the sales in the

U.S. market, it will compare sales in those markets at different levels of trade and

account for that difference by, depending on the circumstances, making a level of trade

adjustment or granting a CEP offset.  *See id.*

Commerce makes a level of trade adjustment when the difference in the level of

trade "(i) involves the performance of different selling activities; and (ii) is demonstrated

to affect price comparability, based on a pattern of consistent price differences between

the sales at the different levels of trade."  19 U.S.C. § 1677b(a)(7)(A); *see also* 19

C.F.R. § 351.412(a)-(b); *Micron Tech.,* 243 F.3d at 1305.  The level of trade adjustment

may either increase or decrease normal value.  19 U.S.C. § 1677b(a)(7)(A).  When the

level of trade in the home market constitutes a more advanced stage of distribution than

the level of trade of the constructed export price to the United States, but Commerce

lacks sufficient data to determine whether the difference affects price comparability to

grant a level of trade adjustment, Commerce will grant a CEP offset.  *See* 19 U.S.C.

§ 1677b(7)(B); 19 C.F.R. § 351.412(f); *Micron Tech., 243* F.3d at 1305.  Commerce

grants a CEP offset by deducting the indirect selling expenses included in the normal

value "up to the amount of indirect selling expenses deducted in determining

constructed export price."  19 C.F.R. § 351.412(f); *see also* 19 U.S.C. § 1677b(a)(7)(B).

A party seeking a CEP offset bears the burden of establishing that the

differences in selling functions performed in the home and U.S. markets are

"substantial." *Sucocitrico Cutrale Ltda. v. United States*, Slip-Op. 12-71, 2012 WL

2317764, at *5 (CIT June 1, 2012) (holding that 19 U.S.C. § 1677b(a)(7)(B), when read

in conjunction with 19 C.F.R. § 351.412(c)(2), requires "that a CEP offset is available

only when there are substantial differences in selling activities between the levels of

trade in the two markets") (internal quotation marks omitted);[5] *see also* 19 C.F.R. §

351.401(b) (the burden of establishing entitlement to a particular adjustment rests with

the party in possession of the relevant information).

## II.   Prior Proceedings

On August 17, 2015, in response to a petition filed by Defendant-Intervenors,

Commerce initiated an antidumping duty investigation covering cold-rolled steel from

Korea.  *Certain Cold-Rolled Steel Flat Products From Brazil, the People's Republic of*

*China, India, Japan, the Republic of Korea, the Netherlands, the Russian Federation,*

*and the United Kingdom*, 80 Fed. Reg. 51,198 (Dep't Commerce Aug. 24, 2015)

---

[5] Pursuant to Commerce's regulations,

> The Secretary will determine that sales are made at different levels of trade if they are made at different marketing stages (or their equivalent). Substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing. Some overlap in selling activities will not preclude a determination that two sales are at different stages of marketing.

19 C.F.R. § 351.412(c)(2).

(initiation of less-than-fair-value investigations). The period of investigation ("POI") was

July 1, 2014, through June, 30, 2015. *Id.*, 80 Fed. Reg. at 51,198.  Commerce selected

Hyundai Steel as one of two mandatory respondents for individual examination.  *See*

Respondent Selection Mem. (Sept. 15, 2015) at 6, CJA Tab 1, PJA Tab 1, PR 78, ECF

No. 57-1.

Commerce issued its initial antidumping questionnaire to Hyundai Steel on

September 18, 2015.  *See* Commerce's Initial Questionnaire to Hyundai Steel (Sep. 18,

2015) ("Hyundai Steel IQ."), CJA Tab 3, PJA Tab 3, PR 89, ECF No. 57-1.  By

November 9, 2015, Hyundai Steel had submitted its responses to Sections A through D

of the initial questionnaire.  *See* Hyundai Steel's § A Resp. (Oct. 16, 2015), CJA Tab 4,

CR 43, PJA Tab 4, PR 113, ECF No. 57-1; Hyundai Steel's § B Resp. (Nov. 6, 2015),

Suppl. CJA Tab 5, CR 111, Suppl. PJA Tab 5, PR 171, ECF No. 65; Hyundai Steel's §

C Resp. (Nov. 9, 2015), Suppl. CJA Tab 6, CR 113, Suppl. PJA Tab 6, PR 159, ECF

No. 65; Hyundai Steel's § D Resp. (Nov. 4, 2015), CJA Tab 5, CR 85, PJA Tab 5, PR

115, ECF No. 57-1.  Between November 2015, and January 2016, Commerce issued

supplemental questionnaires to Hyundai Steel, to which Hyundai Steel responded

between November 2015 and February 2016.  *See* Hyundai Steel's Suppl. § A Resp.

(Nov. 18, 2015), CJA Tab 8, CR 142, PJA Tab 8, PR 195, ECF No. 57-1; Hyundai

Steel's Suppl. §§ B and C Resp. (Dec. 15, 2015), CJA Tab 9, CR 191, PJA Tab 9, PR

228, ECF No. 57-2;  Hyundai Steel's Second Suppl. §§ B and C Resp. (Feb. 2, 2016),

CJA Tab 10, CR 288-300, PJA Tab 10, PR 282, ECF No. 57-3.  Because Hyundai

Steel's responses implicate different issues, the court provides further factual

background relating to each relevant section when helpful to the analysis.

On March 7, 2016, Commerce published its preliminary determination, finding

that there were sales of subject merchandise from Korea being, or likely to be, sold in

the United States at less than fair value. *See Certain Cold-Rolled Steel Flat Products*

*From the Republic of Korea*, 81 Fed. Reg. 11,757 (Dep't Commerce Mar 7, 2016) (aff.

prelim. determination of sales at less than fair value and postponement of final

determination) ("*Preliminary Determination*"), and accompanying Prelim. Decision

Mem., A-580-881 (Feb. 29, 2016) ("Prelim. I&D Mem."), CJA Tab 13, PJA Tab 13, PR

313, ECF No. 57-3.  Commerce preliminarily determined a weighted-average

antidumping duty margin for Hyundai Steel of 2.17 percent.  *Preliminary Determination*,

81 Fed. Reg. at 11,758.

Commerce conducted a cost verification of Hyundai Steel from January 18-29,

2016 and a sales verification from March 14-18, 2016, in Seoul, Korea.  *See* Verification

of the Cost Resp. of Hyundai Steel Co. (May 20, 2016) ("Cost Verification Report"),

Suppl. CJA Tab 7, CR 595, Suppl. PJA Tab 7, PR 344, ECF No. 65; Verification of

Hyundai Steel Corp. on Sales Resp. in the Antidumping Duty Investigation of Cold-

Rolled Steel Flat Products from the Republic of Korea, (May 26, 2016) ("Sales

Verification Report"), Suppl. CJA Tab 8, CR 598, Suppl. PJA Tab 8, PR 347, ECF No.

65.  Commerce conducted sales verifications of Hyundai Steel's U.S. subsidiary,

Hyundai Steel America, Inc. ("HSA"), from April 27-28, 2016, in Greenville, Alabama.

Verification of the Sales Resp. of Hyundai Steel America (May 26, 2016) ("HSA Sales

Verification Report") at 1, CJA 18, CR 597, PJA 18, PR 346, ECF No. 57-5.

On July 29, 2016, Commerce issued its *Final Determination*, in which it

calculated a weighted-average dumping margin of 34.33 percent for Hyundai Steel.

*Final Determination*, 81 Fed. Reg. at 49,954.  Commerce applied AFA to Hyundai

Steel's home market inland freight and warehousing expenses, international freight, and

U.S. inland freight.  I&D Mem. at 74. Commerce also applied partial AFA to certain cost

data for four specifications of products for which it determined that Hyundai Steel and

HSA had reported inaccurate, inconsistent, or unverifiable CONNUMS.  *Id.* at 59-63.

Additionally, Commerce denied Hyundai Steel a statutory CEP offset based on its

finding that Hyundai Steel's home market level of trade was not more advanced than its

U.S. level of trade.  *Id.* at 87-89.

On August 1, 2016, Hyundai Steel submitted ministerial error comments on the

*Final Determination*.  *See* Hyundai Steel's Ministerial Error Comments (Aug. 1, 2016),

CJA Tab 24, CR 621, PJA Tab 23, PR 382, ECF No. 57-5.  Following rebuttal

comments, Commerce determined that it had made two ministerial errors with respect

to Hyundai Steel's home market inland freight from plant to port of exportation and with

regard to the assignment of CONNUMs, but left its *Final Determination* undisturbed

because the errors did not affect the estimated weighted-average dumping margin for

Hyundai Steel.[6]  Ministerial Error Mem. (Aug. 31, 2016) at 1, CJA Tab 25, CR 623, PJA

Tab 25, PR 385, ECF No. 57-5.  Subsequently, following an affirmative determination by

the International Trade Commission that an industry in the United States is materially

injured by reason of dumped imports of certain cold-rolled steel from Korea, Commerce

---

[6] Plaintiff requests the court to remand Commerce's determination "with instructions to
Commerce to correct [the] errors" alleged by Plaintiff, and "to provide such other relief
as this court deems just and appropriate."  Pl.'s Br. at 45; Pl. Hyundai Steel's Reply Br.
in Supp. of its Rule 56.2 Mot. for J. Upon the Agency R. ("Pl.'s Reply") at 24, ECF No.
55.  Because the court remands Commerce's determination on other bases, it will
instruct the agency to reconsider this ministerial error finding in light of any changes
made on remand.  *See infra* Conclusion.

issued the antidumping duty order on September 20, 2016.  *Certain Cold-Rolled Steel*

*Flat Products from Brazil, India, the Republic of Korea, and the United Kingdom*, 81

Fed. Reg. 64,432 (Dep't Commerce Sept. 20, 2016) (am. final aff. antidumping

determinations for Brazil and the United Kingdom and antidumping duty orders).  On

October 20, 2016, Hyundai Steel timely instituted this litigation.  *See* Summons, ECF

No. 1.

JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(i) of the Tariff Act of

1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i), and 28 U.S.C. § 1581(c).  The court

will uphold an agency determination that is supported by substantial evidence and

otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

DISCUSSION

I.   **Commerce's Application of AFA to Freight and Warehousing Transactions**

A.  **Relevant Factual Background**

*i.  Domestic and International Freight and Warehousing Services*

In its initial questionnaire, Commerce instructed Plaintiff to report its sales and

cost information for itself and its "affiliates involved with the production or sale of the

products under investigation during the [POI] in the foreign market or the United States."

Hyundai Steel IQ at G-10 (emphasis omitted).  Hyundai Steel reported that an affiliated

company provided domestic inland freight from plant to warehouse, domestic

warehousing services, domestic inland freight from plant/warehouse to customer,

domestic inland freight for U.S. sales from factory to port, and international freight.

Hyundai Steel's § B Resp. at B-27—B-30, Hyundai Steel's § C. Resp. at C-26—C-27,

C-29.[7]  Hyundai Steel stated it was affiliated with this provider by virtue of both

companies belonging to the Hyundai Motor Group, "a group of legally independent

companies having certain limited cross-ownership."  Hyundai Steel's § A Resp. at A-

11—A-12.  Hyundai Steel reported that Hyundai Motor Group and its chairman, M.K.

Chung, "commonly control Hyundai Steel."  *Id.* at A-11.

    In its reporting, Hyundai Steel asserted that it "will demonstrate . . . that

transactions with affiliated service providers are at arm's length."  *Id.* at A-13.  For inland

freight and warehousing services for home market sales, Hyundai Steel provided a

calculation worksheet from a sample shipment during the POI and the freight and

warehousing contracts with its affiliated service provider.  Hyundai Steel § B Resp. at B-

28, B-30—B-31, Ex. B-14.  Hyundai Steel explained that it does not use unaffiliated

freight companies for similar services and, therefore, "is unable to provide comparable

prices from unaffiliated vendors for comparison."  *Id.* at B-30.  Instead, it provided

calculations from its affiliated company's financial statements "demonstrating that the

company earned a profit during the POI," which Hyundai Steel construed to be a

sufficient showing "that these transactions reflect arm's length prices."  *Id.* at B-30—B-

31; *see also id.*, Exs. B-14, B-15.  Hyundai Steel provided a similar response for inland

freight services from factory to port for its U.S. sales.  *See* Hyundai Steel § C Resp. at

C-27.  Similarly, for international freight, Hyundai Steel provided a sample calculation of

its international freight expense, its contract with its affiliated company, and the affiliated

company's freight contract with a sub-contractor.  *Id.* at C-29; *see also id.*, Ex. C-10.

---

[7] The name of the affiliated provider of those services is [[          ]].  For confidentiality
purposes, throughout this opinion the court refers to [[          ]] as Hyundai Steel's
"affiliate," "affiliated company," or "affiliated service provider."

Commerce issued a supplemental questionnaire seeking further information related to inland freight, warehousing expenses, and international freight.  *See* Hyundai Steel's Suppl. §§ B and C Resp.  For inland freight for home market sales, Commerce requested a complete copy of the freight contract between Hyundai Steel and its affiliate, all freight contracts between its affiliate and all unaffiliated freight providers that cover the full POI, and several other freight documents.  *Id.* at 6-7.  Commerce alerted Plaintiff that the net profit information it had previously provided did not demonstrate that Hyundai Steel's affiliate earned a profit for its freight services.  *Id.* at 8.   Relatedly, Hyundai Steel provided a copy of its freight contract with its affiliate.  *Id.* at 6; *see also id.*, Ex. S-6.  However, while it stated that its affiliate maintained contracts with over 30 subcontractors, Hyundai Steel provided only one freight contract with one of those sub-contractors.  *Id.* at 7; *see also id.*, Ex. S-7.[8]  Hyundai Steel asserted that a comparison of its contract with its affiliate and the affiliate's contract with its subcontractor demonstrated that Hyundai Steel's affiliate earned a profit from its freight services, which in turn, according to Hyundai Steel, "demonstrate[d] that these services were negotiated at arm's length."  *Id.* at 8.

For warehousing expenses, Commerce similarly requested a complete copy of Hyundai Steel's contract with its affiliate and contracts between its affiliate and all unaffiliated providers covering the full POI.  *Id.* at 9.  With respect to this request, Hyundai Steel provided the same response as it did for inland freight for home market sales, citing to its affiliate's contract with one subcontractor.  *Id.* (citing *id.*, Ex. S-7).

---

[8] The affiliate's subcontractor was [[                    ]].  Hyundai Steel's Suppl. §§ B and C Resp. at 7.

Commerce also asked Hyundai Steel to "demonstrate that the warehouse expenses provided by [Hyundai Steel's affiliate] are at arm's length prices for each warehouse" and alerted Plaintiff that "[t]he net profit information provided for [the affiliated company] does not show that [the affiliated company earned a profit from its warehousing services]."  *Id.* at 10.  Hyundai Steel again asserted that a comparison between its contract with its affiliate and its affiliate's contract with its subcontractor demonstrates the arm's length nature of the warehousing services.  *Id.*

For inland freight services from factory to port for U.S. sales, Commerce requested that Hyundai Steel provide copies of all freight contracts with its affiliate and all unaffiliated freight providers that cover the full POI.  *Id.* at 20.  Commerce also requested the prices that Hyundai Steel's affiliate charged to unaffiliated customers for similar services.  *Id.* at 21.  Although Hyundai Steel stated that its affiliate had contracts with almost 40 subcontractors, it provided, "as a representative sample," a contract between its affiliate and only one of the affiliate's subcontractors.  *Id.* at 20-21.  In response to Commerce's request for the affiliated company's inland freight prices to its unaffiliated customers, Hyundai Steel explained that its affiliate "does not provide comparable services to unaffiliated customers."  *Id.* at 21.

For international freight expenses, Commerce requested "all international freight contracts between [Hyundai Steel's affiliate] and its unaffiliated customers."  *Id.* at 24.  Hyundai Steel confirmed that its affiliate "does not have any contracts with unaffiliated customers for shipments to the United States."  *Id.*  It further explained that while "[Hyundai Steel's affiliate] does provide shipping services to unaffiliated customers for

shipments to third countries, [it] has declined Hyundai Steel's request to provide its contracts with unaffiliated third parties" due to confidentiality concerns.  *Id.*

In a second supplemental questionnaire, Commerce requested two categories of information pertaining to inland freight services to warehouse: (1) "actual costs paid by Hyundai Steel to [its affiliate]" and (2) "copies of all contracts that [Hyundai Steel's affiliate] has with all unaffiliated parties for similar services that covers the POI." Hyundai Steel's 2nd Suppl. §§ B and C Resp. at 2.  As to the first request, Hyundai Steel produced an exhibit that provided a comparison of Hyundai Steel's freight expenses and its affiliated service provider's total costs incurred.  *Id.* at 2; *see also id.*, Ex. 2.  As to the second request, Hyundai Steel reiterated that its affiliate does not offer similar services to unaffiliated parties; therefore, no such contracts existed.  *Id.* at 2.

During verification of Hyundai Steel's sales responses, the agency sought to verify that Hyundai Steel's freight services were provided at arm's length.  Sales Verification Report at 3.  Among other items, Commerce again requested (1) "complete copies of freight contracts between [Hyundai Steel's affiliate] and its unaffiliated freight providers that cover the full POI"; (2) complete freight documents between Hyundai Steel and its affiliate related to transportation of the subject merchandise; (3) copies of all contracts between Hyundai Steel's affiliate and unaffiliated parties for similar services during the POI; and (4) detailed records, supported by source documentation, of the actual costs incurred by Hyundai Steel's affiliate.  *Id.* at 42.  Hyundai Steel provided to Commerce a chart showing a comparison of its freight costs with its affiliate's total costs; however, the information in the chart was not based on transaction documents.

*See id.*  Rather, Hyundai Steel provided a sample inland freight contract for a single transaction to show that the amount in the contract matched that in the chart.  *See id.*

    While Hyundai Steel provided examples of some contracts between its affiliate and the affiliate's subcontractor to demonstrate that its affiliate made a profit, it did not provide requested information that was in its affiliate's possession for the asserted reason that "there was no 'direct ownership'" to compel its affiliate to provide the information.  *Id.* at 42-43.  Specifically at issue were the contracts Hyundai Steel's affiliate maintained with unaffiliated parties for similar services covering the POI.  *See id.*  During verification, Hyundai Steel admitted that it did not go through other channels, such as other affiliates in the Hyundai Group, to try to obtain the information that Commerce requested; it had only asked its affiliate directly.  *See id.* at 43.

    Also during verification, Commerce requested a list of shareholders for Hyundai Steel's affiliate.  *Id.* at 43.  Upon examining the list of shareholders, and comparing it with the translated list of Hyundai Steel's Board Members, Commerce verified that the majority owner of Hyundai Steel's affiliate was also the Vice Chairman of Hyundai Steel.  *See id.*  Commerce verified that a large shareholder of Hyundai Steel's affiliate was also the direct and indirect owner of Hyundai Steel.  *See id.* at 43-44.  Moreover, Hyundai Steel's officials confirmed that those two individuals were father and son.  *See id.* at 43.  Given this information, Commerce, again, reiterated its request for the documentation from Hyundai Steel's affiliate, but Hyundai Steel continued to maintain that it had no direct control over its affiliate to compel the company to provide the missing documentation.  *See id.* at 44.

## ii.  U.S. Freight Services

In discussing its affiliates in its Section A questionnaire response, Hyundai Steel identified a subsidiary of Hyundai Steel's affiliate as "involved in transporting cold-rolled and products manufactured from cold-rolled steel in the United States."  Hyundai Steel's § A Resp. at A-12—A-13.[9]  Hyundai Steel did not mention this or any other subsidiary of its affiliate in its initial or supplemental Section C responses.  *See* Hyundai Steel's § C Resp.; Hyundai Steel's Suppl. §§ B and C Resp.

During verification of the sales response of HSA, Commerce discovered that two U.S. subsidiaries of Hyundai Steel's affiliate provided U.S. inland freight from port to warehouse.  *See* HSA Verification Report at 12.[10]  Commerce further discovered that one of those subsidiaries and two other unaffiliated companies provided the U.S. inland freight from warehouse to customer.  *See id.*[11]

## iii.  Final Determination

Commerce used AFA to determine Hyundai Steel's antidumping duty margin on the basis of its asserted inability to provide the information requested at verification. I&D Mem. at 73 & n.368 (citing Sales Verification Report at 3).  Commerce explained that during Hyundai Steel's sales verification, it verified that of the two largest shareholders of Hyundai Steel's affiliate, one is also a part owner, and the other is the Vice Chairman, of Hyundai Steel.  *Id.* at 73-74 & n.372 (citing Sales Verification Report at 3).  Moreover, the two individuals were father and son, respectively.  *Id.* at 74.

---

[9] The company was [[
]].  Hyundai Steel's § A Resp. at A-12.
[10] [[            ]] provided the freight service for container shipments and [[          ]] provided the freight service for all other shipments.  HSA Verification Report at 12.
[11] The unaffiliated companies were [[                                    ]].  *Id.*

Commerce concluded that the same family members held and commonly controlled

Hyundai Steel and its affiliate during the POI.  *Id.* at 74.   It explained that "Hyundai

Steel defined the companies that are members of the Hyundai Motor Group and/or are

held by the Chung family as being affiliated parties via control by a 'group,' which has

the ability to directly or indirectly control its group members, and are expected to

cooperate with the [agency's] antidumping investigation."  *Id*. at 74.

Commerce found that Hyundai Steel failed to demonstrate the arm's length

nature of the services provided by its affiliate and its affiliate's U.S. subsidiaries.  *Id.* at

74.  This failure was a result of Hyundai Steel's insistence "that [it] could not obtain the

affiliated company's information requested by the [agency]."  *Id*.  Therefore, Commerce

relied on facts otherwise available pursuant to section 19 U.S.C. § 1677e(a) for

warehousing and freight service expenses.  *Id*.  Moreover, the agency determined that

Hyundai Steel's failure to provide the requested information "or fully cooperate with the

[agency's] request for this information" warrants the application of an adverse inference

pursuant to section 19 U.S.C. § 1677e(b).  *Id*.  Commerce applied AFA to determine

Hyundai Steel's home market inland freight and warehousing expenses, international

freight, and U.S. inland freight.  *Id*.  For home market inland freight and warehousing,

the agency applied Hyundai Steel's lowest reported value in its home market inland

freight and warehousing fields.  *Id*.  For international freight and U.S. inland freight,

Commerce used Hyundai Steel's highest reported expenses based on each destination.

*Id*.  For home market inland freight for U.S. sales, Commerce selected the second-

highest transaction-specific value as AFA.  *Id*.

Plaintiff poses three challenges to Commerce's *Final Determination*: (1) that the

record confirms that Hyundai Steel's transactions with its affiliated providers were made

on an arm's-length basis; (2) that Commerce's determination to apply AFA with respect

to transactions with its affiliated service providers was contrary to law; and (3) that

Commerce's AFA adjustments were unreasonable and contrary to law.  *See* Pl.'s Br. at

17-32.  The court addresses each argument in turn.

### B. Commerce's Determination that Hyundai Steel Failed to Prove the Arm's Length Nature of The Transactions With its Affiliated Providers is Supported by Substantial Evidence

Plaintiff argues that the information it provided in the initial and supplemental

questionnaire responses demonstrates that its affiliate earned a profit for rendering the

freight and warehousing services, which was sufficient to show that those transactions

were at arm's length.  Pl.'s Br. at 17.[12]  Plaintiff faults the agency for changing course

from the *Preliminary Determination*, arguing that Commerce verified the reported

information it relied upon in the *Preliminary Determination* and, therefore, should have

continued to rely on the same information for the *Final Determination*.  Pl.'s Br. at 19

(citing Sales Verification Report at 42, 43; Sales Verification Exs. ("SVE"), Ex. 28, CJA

Tab 15, CR 388, PJA Tab 15, PR 326, ECF No. 57-4).

At the outset, Plaintiff's argument that Commerce erred in declining to rely on the

same information as it did in the *Preliminary Determination* is incorrect.  It is premised

on the contentions that Commerce verified Plaintiff's reported information, and that the

*Preliminary Determination* was consistent with the parallel investigation on corrosion

---

[12] By contrast, Plaintiff does not offer any argument or point to any evidence to show that the transactions with its affiliate's U.S. subsidiary were arm's length.  *See* Pl.'s Br. at 17-20.

resistant steel, which the agency should have followed.[13]  *See* Pl.'s Br. at 18-19.

Commerce did not verify that Hyundai Steel's reported freight and warehousing

expenses were on an arm's length basis.  Specifically, the Sales Verification Report

states that it "does <u>not</u> draw conclusions as to whether the reported information was

successfully verified, and further does <u>not</u> make findings or conclusions regarding how

the facts obtained at verification will ultimately be treated in the [agency's]

determinations."  Sales Verification Report at 1; *see also* I&D Mem. at 73-74.  Prior to

verification, Commerce acknowledged Plaintiff's documents purporting to show the

affiliate's net profits in rendering these services for Hyundai Steel, but notified the

company that the submitted information was insufficient to show that its affiliate earned

a profit for the provision of the services in question.  Hyundai Steel's Suppl. §§ B and C

Resp. at 8.   In supplemental questionnaires and at verification, Commerce requested

complete information for its review, to which Plaintiff responded by providing only self-

selected information.  *See id.* at 6-7, 9, 20-21, 24 & Exs. S-6, S-7; Sales Verification

---

[13] Plaintiff avers that the *Preliminary Determination* was consistent with Commerce's decision in the parallel investigation on corrosion resistant steel, "where Commerce relied on similar documentation for similar services and calculated an arm's length adjustment."  Pl.'s Br. at 18 (citing *Certain Corrosion-Resistant Steel Products From the Republic of Korea*, 81 Fed. Reg. 35,303 (Dep't Commerce June 2, 2016) (final determination of sales at less than fair value and final aff. determination of critical circumstances), and accompanying Issues and Decision Mem. A–580–878 (May 24, 2016) at Cmt. 8).  However, final determinations in antidumping duty investigations must be supported by substantial evidence on the record, and the record of each investigation is distinct.  Thus, the question before the court is whether Commerce's determination in this case is supported by substantial evidence on this record.  What Commerce may have concluded in a parallel investigation of a different product with a separate record is of little moment.  *See Yama Ribbons & Bows Co. v. United States*, 36 CIT ___, ___, 865 F. Supp. 2d 1294, 1298 (2012) ("Commerce must base its decisions on the record before it in each investigation"); *Shandong Huarong Mach. Co. v. United States*, 29 CIT 484, 491 (2005) ("[E]ach administrative review is a separate segment of proceedings with its own unique facts.").

Report at 3, 42-44.  In fact, at verification, Commerce noted that some of the information

that Plaintiff submitted "was not based on actual transaction documents."  Sales

Verification Report at 42.

"Preliminary determinations are 'preliminary' precisely because they are subject

to change."  *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995).

The purpose of verification and briefing by the parties is to enable the agency to

determine dumping margins "as accurately as possible."  *Cf. Yangzhou Bestpak Gifts &*

*Crafts Co. Ltd. v. United States,* 716 F.3d 1370, 1379 (Fed. Cir. 2013) ("An overriding

purpose of Commerce's administration of antidumping laws is to calculate dumping

margins as accurately as possible.").  Therefore, it follows that "Commerce has the

flexibility to change its position from the preliminary to the final results," provided it

"explains the basis for the change" and its decision is supported by substantial evidence

and in accordance with law.  *See Timken Co. v. United States*, 23 CIT 509, 515, 59 F.

Supp. 2d 1371, 1376. (1999) (internal quotation marks and citation omitted).   As

discussed below, Commerce explained the basis for its application of AFA with respect

to freight and warehousing transactions in its final determination.  Its factual findings are

supported by substantial evidence and its final determination on these expenses is

otherwise in accordance with law.

### C.  Commerce's Determination to Apply AFA is Supported by Substantial Evidence and in Accordance with Law

As an initial matter, substantial evidence supports Commerce's decision to apply

facts available.  The statute provides that Commerce shall rely on the facts available

when a respondent withholds requested information or fails to provide requested

information.  19 U.S.C. § 1677e(a)(2).   Here, Commerce relied on facts available

because Hyundai Steel failed to demonstrate the arm's length-nature of its transactions with affiliated parties and failed to provide requested information.  I&D Mem. at 74.

The record demonstrates that Plaintiff withheld information requested by Commerce.  Regarding domestic and international freight and warehousing services, Commerce notified Plaintiff that the information it supplied in its initial questionnaire responses was insufficient to demonstrate the arm's length nature of the transactions. *See* Hyundai Steel's Suppl. §§ B and C Resp. at 8, 10.[14]  Commerce informed Hyundai Steel precisely what documentation was necessary to make that showing, and requested contracts from Hyundai Steel's affiliate with all of its unaffiliated service providers.  *See id.* at 6-7, 9.  Instead of complying with these requests, Plaintiff chose to provide a self-selected, allegedly "representative sample," consisting of a single contract between its affiliate and one subcontractor.   *Id.* at 20; *see also id.* at 7, 9.  Plaintiff declined altogether to provide its affiliate's contracts with unaffiliated parties to third country destinations.  *Id.* at 24.  Likewise, at verification, Plaintiff again declined to provide the freight and warehousing information in the manner requested by Commerce, instead proffering cost comparisons not based on transaction documents, and selective contracts of its affiliate.  Sales Verification Report at 42.

In light of the foregoing, Commerce reasonably found that Plaintiff's alternate submissions were insufficient, and that it could not complete the arm's-length analysis without the information it had requested.  A respondent has an obligation "to fully

---

[14] Regarding U.S. inland freight, Plaintiff provided no information in its Section C responses that two U.S. subsidiaries of Hyundai Steel's affiliate provided U.S. inland freight from port to warehouse or any information attempting to show that those transactions were arm's length.  *See* HSA Verification Report at 12 (stating that Commerce discovered this information for the first time at verification).

disclose all requested information, and cannot select which facts, from the range of

information requested, it will report to Commerce." *Fujian Lianfu Forestry Co. v. United*

*States*, 33 CIT 1056, 1066, 638 F. Supp. 2d 1325, 1340 (2009) (citing *NTN Corp. v.*

*United States*, 28 CIT 108, 117, 120, 306 F. Supp. 2d 1319, 1329, 1332 (2004)). There

is, thus, substantial evidence on the record demonstrating that Hyundai Steel withheld

information pursuant to 19 U.S.C. § 1677e(a).

Substantial evidence further supports Commerce's decision to apply an adverse

inference, which was otherwise in accordance with law.[15]   As discussed above,

Commerce "may use an inference that is adverse to the interests of [a respondent] in

selecting from among the facts otherwise available" when the respondent "fail[s] to

cooperate by not acting to the best of its ability to comply with a request for information."

19 U.S.C. § 1677e(b)(1)(A).   Commerce may apply an adverse inference in

circumstances under which it is it is reasonable for the agency "to expect that more

forthcoming responses should have been made."   *Nippon Steel*, 337 F.3d at 1382.

Commerce applied an adverse inference after finding that there was common control

and a familial relationship between Hyundai Steel and its affiliate, and, despite this

common control and familial relationship, "Hyundai Steel failed to provide the requested

---

[15] At issue here is the subjective prong of the *Nippon Steel* test; i.e., whether Commerce
has shown that Hyundai Steel's failure to supply the requested information "[was] the
result of [Hyundai Steel's] lack of cooperation in . . . failing to put forth its maximum
efforts to investigate and obtain the requested information from its records." *Nippon
Steel*, 337 F.3d at 1382-83.  Plaintiff does not contend that Commerce has failed to
make the requisite "objective showing that a reasonable and responsible importer would
have known that the requested information was required to be kept and maintained
under the applicable statutes, rules, and regulations."  *Id.* at 1382.

information or fully cooperate with the [agency's] request for [] information."  I&D Mem.

at 74.

As a threshold matter, Commerce's factual determination with respect to the

common control and familial relationship between Hyundai Steel and its affiliate is

supported by substantial evidence.  Section 1677(33) defines "affiliated persons" as

"[m]embers of a family," an "officer or director of an organization and such organization,"

or "[t]wo or more persons directly or indirectly controlling, controlled by, or under

common control with, any person."  19 U.S.C. § 1677(33).  Moreover, "a person shall be

considered to control another person if the person is legally or operationally in a position

to exercise restraint or direction over the other person."  *Id.*  In determining whether

control over another person exists, Commerce considers, *inter alia*, corporate or family

groupings.  *See* 19 C.F.R. § 351.102(b)(3).

Pertinent here, Hyundai Steel stated in its initial response that "Hyundai Motor

Group and M.K. Chung (the chairman of the group) commonly control Hyundai Steel."

Hyundai Steel's § A Resp. at A-11.  Hyundai Steel identified its affiliate as belonging to

the Hyundai Motor Group, *id.* at A-12, and defined the relationship with its affiliate as

being under "common control of the Hyundai Motor Group through its chairman, M.K.

Chung," *id.* at A-11.  Commerce verified that M.K. Chung was one of the two largest

shareholders of Hyundai Steel's affiliate.  I&D Mem. at 73; Sales Verification Report at

3; SVE, Ex. 28.  Moreover, M.K. Chung is the father of E.S. Chung, who was both the

Vice Chairman of Hyundai Steel and the second of the two largest shareholders of

Hyundai Steel's affiliate.[16]  I&D Mem. at 73-74 & nn.372-373; Sales Verification Report

at 3; Hyundai Steel's § A Resp. at A-11.

The court's assessment of whether Hyundai Steel "put forth its maximum efforts

to investigate and obtain the requested information from its records," *Nippon Steel*, 337

F. 3d at 1382-83, necessarily must assess whether Plaintiff could or should have been

able to obtain the information in its affiliate's possession.   Given the nature of the

affiliation between Hyundai Steel and its affiliate, the agency reasonably expected that

Hyundai Steel would be able to access its affiliate's documentation.  *See Hyundai Steel*,

279 F. Supp. 3d at 1362 (upholding Commerce's determination to apply AFA to Hyundai

Steel's freight, warehousing, and insurance transactions with its affiliates under similar

circumstances because the "agency reasonably expected that Hyundai would be able to

access its affiliates' documentation").   The burden of creating an adequate record

before Commerce lies with interested parties.  *QVD Food Co. v. United States*, 658

F.3d 1318, 1324 (Fed. Cir. 2011).   Placing this burden on the respondent is consistent

with the fact that Commerce lacks subpoena power to require the respondent or any

other interested party to respond to information requests.  *See Rhone Poulenc, Inc. v.*

*United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990).   Rather, Congress gave the

---

[16] Plaintiff argues that Commerce's verification of the overlap in family members
between Hyundai Steel and its affiliate does not support the application of AFA.  Pl.'s
Br. at 26-28.  Plaintiff asserts that it had previously disclosed its affiliation with all parties
that played a role in the sale and production of the subject merchandise and
Commerce's verification of the overlap did not contradict Plaintiff's prior submissions on
this point.  *Id.* at 26-27.  As Defendant points out, however, Commerce confirmed at
verification a translation inconsistency in the record documents, "which otherwise would
not have been highlighted."  Gov.'s Resp. at 26 (citing Sales Verification Report at 43).
Having provided inconsistent translations of the names of these father and son
shareholders, Hyundai Steel cannot reasonably maintain that it informed Commerce of
the full relationship between these companies.

agency the authority to use facts available to fill any gaps in the record and, when

certain conditions are present, to make an adverse inference in the selection of the

available facts.  *See* 19 U.S.C. § 1677e(a),(b).  This court has upheld Commerce's use

of AFA when a respondent failed to induce an affiliate to cooperate with Commerce's

request for information.  *See Hyundai Steel*, 279 F. Supp. 3d at 1361-1364; *Kawasaki*

*Steel Corp. v. United States*, 24 CIT 684, 694, 110 F. Supp. 2d 1029, 1038 (2000)

(noting Commerce's "general practice of attributing failure of an affiliate to the

respondent.").

        Plaintiff seems to suggest that it was relieved of its responsibility to fully comply

with Commerce's requests because it "explained that its affiliate had declined to provide

the documentation due to confidentiality concerns, but in any event there was no data or

documentation pertaining to comparable transactions."  Pl.'s Br. at 21-22 (citing

generally Hyundai Steel's Suppl. §§ B and C Resp.; Hyundai Steel's 2nd Suppl. §§ B

and C Resp.).  Plaintiff also seems to suggest that Commerce based its AFA

determination solely on Hyundai Steel's failure to provide its affiliate's contracts with

unaffiliated parties for shipments to third countries.  *See* Pl.'s Reply at 11.  The agency

explained, however, that its AFA finding was based on Hyundai Steel's failure to provide

information responsive to the agency's specific request for "*certain* freight information

between its affiliate and other unaffiliated parties"; it did not limit its finding to only the

missing third country shipping records.  I&D Mem. at 73; *see also* Sales Verification

Report at 41-44.  Even if Plaintiff's reading of Commerce's determination is correct,

Plaintiff nonetheless declined to produce information—contracts to third country

destinations—responsive to Commerce's request for an alternate benchmark to test the

arm's length nature of the freight transactions.

Hyundai Steel offered no explanation for why its affiliate was willing to provide

only selective information in response to Commerce's requests.  *See* Sales Verification

Report at 44.  Although Plaintiff asserted it was unable to procure the information from

its affiliate due to lack of "direct ownership," the record does not disclose any additional

steps that Hyundai Steel took to procure the information.  *See id.* at 43 (Hyundai Steel

admitted that it did not go through other channels, such as other affiliates in the Hyundai

Group, to try to obtain the information that Commerce requested; it asked its affiliate for

information, but the response was "no").  There is nothing on the record to suggest that

Hyundai Steel offered an alternative solution to its affiliate to provide the information to

Commerce directly so as to avoid the affiliate's confidentiality concerns.  Under these

circumstances, Hyundai Steel cannot be said to have "put forth its maximum efforts to

investigate and obtain requested information from its records."  *Nippon Steel*, 337 F.3d

at 1382; *see also Hyundai Steel*, 279 F. Supp. 3d at 1363 (upholding Commerce's use

of AFA under similar circumstances); *Cf. Kawasaki*, 24 CIT at 692-93, 110 F. Supp. 2d

at 1037-38 (upholding Commerce's determination to apply partial AFA to missing

information that the respondent's affiliate refused to provide when substantial evidence

showed that the respondent had means to induce cooperation from its affiliate, to wit,

the ability to: (1) influence the affiliate's cooperation through the shareholders'

agreement; (2) address the issue with a joint venture partner; (3) invoke rights to the

affiliate's data under the shareholders' agreement).

Plaintiff argues that Commerce violated 19 U.S.C. § 1677m(d) by failing to notify

Plaintiff of any deficiencies in its submissions and provide it the opportunity to correct or

explain the deficiencies.  Pl.'s Br. at 22.  Pursuant to 19 U.S.C. § 1677m(d), if

Commerce determines that a respondent has not complied with a request for

information, it must promptly inform that respondent of the nature of the deficiency and,

to the extent practicable in light of statutory investigation time-limits, provide that

respondent "an opportunity to remedy or explain the deficiency."  19 U.S.C. § 1677m(d).

Commerce's supplemental questionnaire notified Plaintiff that its initial submissions

were insufficient to demonstrate the arm's length nature of the transactions and

identified the information it needed to make that showing.  *See* Hyundai Steel's Suppl.

§§ B and C Resp.  Commerce, therefore, fulfilled its obligation under § 1677m(d).  *See*

*Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1361 (Fed. Cir. 2017) (holding

that Commerce satisfied its obligation under § 1677m(d) when the respondent "failed to

provide the information requested in Commerce's original questionnaire, and the

supplemental questionnaire notified [the respondent] of that defect."); *NSK Ltd. v.*

*United States*, 481 F.3d 1355, 1360 n.1 (Fed. Cir. 2007)(holding that "Commerce . . .

satisfied its obligations under section 1677m(d) when it issued a supplemental

questionnaire specifically pointing out and requesting clarification of [the] deficient

responses.").

Likewise, Plaintiff's assertion that Commerce "turned the verification exercise and

administrative proceeding into a trap," Pl.'s Br. at 23, is unconvincing.  From the

initiation of the investigation, Commerce advised Hyundai Steel that "[a]ll information

submitted may be subject to verification."  Hyundai Steel IQ at G-9.  In its verification

agenda, Commerce specifically advised that the list of topics to be considered and documents to be examined "should be considered illustrative but not all inclusive." Verification Agenda (Feb. 29, 2016) at 4, CJA Tab 11, CR 322, PJA Tab 11, PR 305, ECF No. 57-3.  Moreover, there was no question that the agency had inquired about the arm's length nature of these service transactions in its initial and supplemental questionnaires.  *See, e.g.*, Hyundai Steel IQ at G-10; Hyundai Steel § A Resp. at A-13; Hyundai Steel's § B. Resp. at B-27—B-29; Hyundai Steel's Suppl. §§ B and C Resp. at 6-9, 20-21, 24.   Thus, Commerce adequately notified Hyundai Steel that it was investigating the transactions between it and its affiliates for the purposes of its arm's-length determination.

In response to Plaintiff's argument that Commerce did not articulate a basis for applying AFA to the U.S. inland freight transactions, Pl.'s Br. at 32, the court finds that the agency's reasoning is sufficiently discernable from the determination itself such that remand is unnecessary,  *see NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009).  The Issues and Decision Memorandum walks through Commerce's analysis: at verification, the agency asked for freight information from Hyundai Steel's affiliate, Hyundai Steel said the affiliate refused to provide the information, Commerce reviewed the relationship between Hyundai Steel and the affiliate (including the affiliate's U.S. subsidiaries), including the family overlap, and concluded that Hyundai Steel and the affiliate were under direct or indirect control by a common group that was expected to cooperate in  the antidumping proceeding.  I&D Mem. at 73-74.

Finding a failure to cooperate, which is the predicate for the application of an adverse inference, necessarily requires assessment of a respondent's efforts undertaken to comply with a request for information.  19 U.S.C. § 1677e(b).  The record supports Commerce's finding that Hyundai Steel did not make its "maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation," *Nippon Steel*, 337 F.3d at 1382; thus, Commerce's determination to apply AFA to Hyundai Steel's U.S. inland freight transactions will be sustained.

In sum, because Commerce did not have verified arm's length freight and warehousing data on the record, it was appropriate, pursuant to 19 U.S.C. § 1677e(a), for the agency to use facts otherwise available to calculate those expenses. Furthermore, because Hyundai Steel failed to make its best efforts to obtain the requested documents, the agency was justified in concluding that Hyundai Steel had not acted to the best of its ability and reasonably used an adverse inference in selecting the facts otherwise available.

### D.  Commerce's Selection of AFA was Reasonable

Hyundai Steel contends that Commerce's selection of AFA was inconsistent with verified record information and, thus, unreasonable.  Pl.'s Br. at 28.  With respect to domestic inland freight expenses, Hyundai Steel asserts that "Commerce applied an unreasonable, punitive, and aberrational result" by selecting as AFA an expense amount that was "2,768 percent or 28 times the reported freight amount."  *Id.* at 29-30 (emphasis omitted).  Hyundai Steel further complains that Commerce's application of AFA to certain transactions for which Hyundai Steel did not incur the freight expense, and transactions with an unaffiliated freight provider, was unsupported by substantial

evidence and not in accordance with law.  *Id.* at 30-31.  With respect to international

freight, Plaintiff avers that Commerce's decision to apply the highest reported rate was

equally egregious because the agency neglected to consider that the vast majority of

Hyundai Steel's shipments were bulk shipments, which would have been cheaper, while

a small percentage of shipments were made via containers, which were more

expensive.  *Id.* at 31.  With respect to U.S. inland freight expenses, Hyundai Steel

reiterates that Commerce made no AFA findings related to these transactions, and,

therefore, could not apply AFA adjustments.  *Id.* at 32.

        "Pursuant to 19 U.S.C. § 1677b(f)(2), Commerce may adjust various expenses

incurred for inputs or services provided by affiliates in the dumping margin calculation to

reflect market values, if necessary."  *Hyundai Steel*, 279 F. Supp. 3d at 1367 (citing 19

C.F.R. §§ 351.402(e), 351.403).  As discussed above, having found that Hyundai Steel

failed to cooperate by not acting to the best of its ability to comply with a request for

information, Commerce was permitted to use an inference that is adverse to Hyundai

Steel's interests in selecting from among the facts otherwise available.  *See* 19 U.S.C.

§ 1677e(b)(1)(A).  In fact, the statute authorizes Commerce to select "any [] information

placed on the record" when drawing an adverse inference pursuant to § 1677e(b)(1).

19 U.S.C. § 1677e(b)(2)(D).  Commerce applied Hyundai Steel's lowest reported value

as AFA for home market inland freight and warehousing.  I&D Mem. at 74.  For

international freight and U.S. inland freight, Commerce applied Hyundai Steel's highest

reported values, by destination, as AFA.  *Id.*  For home market inland freight for U.S.

sales, Commerce applied the second-highest transaction-specific value as AFA.  *Id.*;

*see also* Final Determination Calculation Analysis Mem. for Hyundai Steel Co. (July 20,

2016) ("Final Sales Calculation Mem.") at 6, CJA Tab 22, CR 610, PJA Tab 22, PR 375,

ECF No. 57-5.

Plaintiff's arguments that "Commerce successfully verified Hyundai Steel's

expenses and had previously confirmed that they were arm's length transactions," Pl.'s

Br. at 28, seek to ignore Hyundai Steel's inability to verify the arm's length nature of its

freight expenses, I&D Mem. at 74.  Therefore, any arguments by Plaintiff predicated on

Commerce's failure to rely on Hyundai Steel's reported information are unpersuasive.

*See* 19 U.S.C. § 1677m(e)(2).[17]   Commerce properly relied on an AFA adjustment

because the reported data could not be verified to be arm's length and, therefore, was

unreliable for purposes of determining Hyundai Steel's margin of dumping.  Such

questionable data cannot be an appropriate benchmark for measuring the

reasonableness of Commerce's selection of AFA.  *See id*.  Plaintiff's characterization of

the adverse inference for domestic inland freight for U.S. sales as a punitive

multiplication of its average reported expense also is predicated on a

mischaracterization of Commerce's determination.  Commerce made a methodological

decision to use the second-highest transaction specific value as AFA.  I&D Mem. at 74;

---

[17] Section 1677m(e) precludes Commerce from disregarding information that is
"necessary to the determination," provided all of the following five criteria are satisfied:
     (1) the information is submitted by the [established] deadline . . .,
     (2) the information can be verified,
     (3) the information is not so incomplete that it cannot serve as a reliable
     basis for reaching the applicable determination,
     (4) the interested party has demonstrated that it acted to the best of its
     ability in providing the information and meeting the requirements
     established by the administering authority or the Commission with respect
     to the information, and
     (5) the information can be used without undue difficulties.
19 U.S.C. § 1677m(e).

Final Sales Calculation Mem. at 6.  Thus, the mathematical relationship between Commerce's selected AFA value and the reported value is irrelevant.

Notwithstanding the above discussion, with respect to Hyundai Steel's arguments that Commerce incorrectly applied AFA with respect to sales for which Plaintiff did not incur domestic inland freight from plant to port or used an unaffiliated freight provider, Pl.'s Br. at 30-31, Commerce has not articulated any justification for this application of AFA and the court cannot provide a justification for the agency.  Consequently, the court will remand this limited aspect of Commerce's application of AFA to the agency for reconsideration or further explanation.

## II.    Commerce's Application of AFA to Plaintiff's CONNUM Reporting

### A.  Relevant Factual Background

In the *Final Determination*, Commerce identified four specifications of products for which it determined that Hyundai Steel and HSA had reported inaccurate, inconsistent, or unverifiable CONNUMs.  *See* I&D Mem. at 59-63.[18]  Three of those specifications related to home market sales and one related to U.S. sales.[19]

---

[18] In antidumping proceedings, Commerce uses CONNUMs "to identify the individual models of products for matching purposes."  *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1347 n.9 (Fed. Cir. 2015) (internal quotation marks and citation omitted); *see also* Gov.'s Resp. at 33 ("Commerce establishes a CONNUM to define the key physical characteristics of the subject merchandise that are commercially meaningful in the U.S. marketplace").  In its investigation, Commerce instructed Hyundai Steel to assign a CONNUM to each unique product reported in the Section B (home market) and Section C (U.S. market) sales data files.  *See* Hyundai Steel IQ at B-7, C-6.  Commerce explained that "products with identical physical characteristics reported in the foreign market sales file and the U.S. market sales file should have the same control number."  *Id.*  Commerce identified steel quality (referred to as "QUALITYH" or "QUALITYU") as one of the reporting characteristics.  *See* Hyundai Steel's § B Resp. at B-13; Hyundai Steel's § C Resp. at C-10, C-11.

[19] Due to the proprietary nature of the specifications, Commerce used "Spec" names in the Issues and Decision Memorandum and provided additional analysis containing the

With respect to Spec D products, Hyundai Steel reported these products as

"commercial quality."  I&D Mem. at 60; Hyundai Steel Sales Verification Report at 2, 21.

Upon reviewing Hyundai Steel's internal product guidelines at verification, Commerce

noted that the mechanical and chemical requirements of the Spec D products

comported with a drawing quality rather than a commercial quality product.  I&D Mem.

at 60; Hyundai Steel Sales Verification Report at 2, 21; Final Sales Calculation Mem. at

4 & nn.5-6 (citations omitted).  Additionally, in examining Hyundai Steel's product coding

designations, Commerce determined that the Spec D products were identified in a way

that was "very obviously characteristic of drawing quality."  I&D Mem. at 60.[20]

With respect to Spec H products, Hyundai Steel had classified these products as

meeting advanced high strength steel ("AHSS") or ultra-high strength steel ("UHSS")

requirements.  I&D Mem. at 60.  However, the information Commerce verified as to the

requirements of AHSS/UHSS products indicated that the Spec H products did not meet

these requirements.  *Id.*; Sales Verification Report at 2, 21; Final Sales Calculation

Mem. at 4.  As a result, Commerce found that Hyundai Steel had no basis to report the

products as AHSS/UHSS quality and that the products were "best characterized for this

investigation as structural quality."  I&D Mem. at 61.

---

product specifications in the confidential Final Sales Calculation Memorandum.  *See*
I&D Mem. at 60-63; Final Sales Calculation Mem. at 3.  With respect to home market
sales, Commerce identified issues with the following products: [[          ]], designated as
"Spec D"; [[          ]], designated as "Spec H"; and [[          ]], designated as "Spec E."
I&D Mem. at 60-61; Final Sales Calculation Mem. at 3.  With respect to U.S. sales,
Commerce identified issues with product [[    ]], designated as "Spec C."  I&D Mem. at
62; Final Sales Calculation Mem. at 3.
[20] For instance, "[[                                                                    ]] as pertaining to
drawing quality steel."  Final Sales Calculation Mem. at 4 & n.7 (citation omitted).

With regard to Spec E products, Hyundai Steel identified a minimum specified yield strength for the products in question.  I&D Mem. at 61& n.291 (citing Hyundai Steel's Sales Verification Report at 18 & SVE, Ex. 12 at 23).  At verification, Commerce discovered that there was no basis for this identification because there was no minimum specified yield strength required for the specification.  I&D Mem. at 61; Sales Verification Report at 18, 21-22.  Thus, Commerce concluded that Hyundai Steel's identification was "unsupported by the record."  I&D Mem. at 61.

Finally, with regard to "Spec C" products, Commerce found that Hyundai Steel inconsistently reported the product code (PRODCOD2U) for U.S. sales by HSA to unaffiliated customers as being commercial quality when the reported quality for CONNUM purposes was either drawing or deep drawing quality.  I&D Mem. at 62.  At HSA's sales verification, Commerce also found inconsistencies in certain reported codes.  Final Sales Calculation Mem. at 4 & n.11 (citation omitted).[21]  Thus, Commerce found there was a lack of explanation for the inconsistent reporting and considered the sales in question to be unverified.  I&D Mem. at 62; *see also* HSA Sales Verification Report at 10; CEP Verification Exs. ("CEP SVE"), EX. 17 at 61, CJA Tab 17, CR 572, PJA Tab 17, PR 341, ECF No. 57-5 (listing the sales Commerce considered unverified).

Commerce determined that the use of facts available was warranted because Hyundai Steel failed to provide necessary information, withheld requested information, significantly impeded the proceeding, and failed to provide information that could be verified.  I&D Mem. at 60 (citing 19 U.S.C. § 1677e(a)(1),(2)).  Commerce further found

---

[21] In the Final Sales Calculation Memorandum, Commerce explained that certain [[        ]] are inconsistent with other [[                    ]]  Final Sales Calculation Mem. at 4-5 & nn.12-13, 15 (citations omitted).

that the application of partial AFA was warranted when data did not exist on the record

and Hyundai Steel was uncooperative.  *Id.* at 59, 63.  Commerce determined that

Hyundai Steel had failed to cooperate to the best of its ability by withholding information

until verification and providing inadequate explanations for its reporting errors and

inconsistencies.  *Id*. at 59-60, 63.  Accordingly, Commerce applied AFA in the following

manner:

> For the U.S. sales associated with the Spec C issue (which are limited to a
> small volume of U.S. sales of products classified under that specification
> and under the two other specifications with comparable linking problems),
> we are assigning as AFA the highest calculated margin for any other
> reported U.S. sale of Hyundai Steel. For Spec D, Spec H, and Spec E, all
> of which involve only home market sales, as AFA we are revising the
> reported product characteristics, and therefore also the CONNUMs, as
> described above, and assigning to the appropriate CONNUMs the highest
> reported total cost of manufacturing for the CONNUMs in question.

*Id.* at 63.

Plaintiff asserts that its CONNUM reporting for each of those product

specifications was reasonable.  Pl.'s Br. at 32-36.  Plaintiff challenges Commerce's

determination to apply AFA as unsupported by substantial evidence and contrary to law,

asserts that the agency had no basis to resort to AFA for Hyundai Steel's reporting, and

further challenges Commerce's AFA adjustment with respect to the U.S. CONNUM data

as unreasonable and an abuse of discretion by the agency. *Id.* at 32, 36-40.

### B. Commerce's Determination to Apply AFA to Hyundai Steel's Home and U.S. Market CONNUM Reporting is Supported by Substantial Evidence and in Accordance with Law

As previously noted, if Commerce determines that a party "has failed to

cooperate by not acting to the best of its ability to comply with a request for information,"

it "may use an inference that is adverse to the interests of that party in selecting from

among the facts otherwise available."  19 U.S.C. § 1677e(b).  Here, Commerce found

that because Hyundai Steel "was unable to substantiate its product reporting, which

include instances in which information was misreported and/or based on inconsistent

internal information, recalculations are possible" through "some application of partial

AFA whe[n] data do not exist on the record to fully correct the problems in question and

the [agency] found Hyundai [Steel] to be uncooperative."  I&D Mem. at 59; *see also id.*

at 60-63.  Substantial evidence supports Commerce's factual findings, and the agency's

determination is in accordance with law.[22]

Hyundai Steel advances no arguments to challenge Commerce's factual findings

with respect to Spec D and Spec H products.  *See* Pl.'s Br. at 35, 36.  With respect to

Spec E products, Plaintiff asserts that given Commerce's confirmation that the product

did not require a yield strength measurement, it was logical for Hyundai Steel not to

maintain a measurement of yield strength.  *Id.* at 35-36.  This assertion, however, does

not explain the basis for Plaintiff's reporting of the minimum yield strength value for

these products.  *See* I&D Mem. at 61 ("Hyundai Steel provided no information indicating

how it had devised the minimum yield strength value it had identified as the basis for

reporting the minimum specified yield strength field.").  Given the lack of explanation or

evidence as to how Hyundai Steel devised the minimum yield strength that it reported,

Commerce reasonably concluded that Hyundai Steel's identification was unsupported

by the record.

---

[22] Plaintiff does not challenge the propriety of Commerce's decision to resort to facts available, instead focusing its arguments on Commerce's decision to apply an adverse inference.  *See* Pl.'s Br. at 36-38.

Regarding Spec C products, Hyundai Steel asserted that the inconsistent

reporting was due to certain products being sold to the final customer on the basis of

less stringent specifications than the specifications to which the products were actually

made.  *Id.* at 62.  Before this court, Hyundai Steel explains that "[t]his could occur, for

example, whe[n] a customer ordered a lower grade product, particularly processed

skelp or sheet, but HSA fulfilled the order with a higher grade steel, based on

availability, inventory, or other considerations."  Pl.'s Br. at 33.  Hyundai Steel asserts

that it reported the CONNUM data based on the physical characteristics of the imported

coil and reported the PRODCOD2U data based on HSA's commercial invoices to the

unaffiliated customer.  *Id.* at 34, 37.  According to Plaintiff, this reporting was consistent

with Commerce's questionnaire instructions.  *Id.* at 37 (citing Hyundai Steel's § C Resp.

at C-7 (requiring the PRODCODU data based on "the product sold" if the product sold

was further manufactured in the United States), C-8 (requiring CONNUM data on "the

product imported" if the product sold is further manufactured in the United States)).

Aside from advancing its theories or explanations for the inconsistent reporting,

Plaintiff points to no evidence to detract from the agency's reasoning that the Spec C

sales in question were unverifiable.  The agency considered Plaintiff's explanations and

the "supporting documentation" for this explanation, which included the HSA production

order and production result line items, *see* HSA Verification Report at 13 (citing CEP

SVE, Ex. 17 at 63); however, it nonetheless concluded that it was "not evident from the

record which, if any, of the Hyundai Steel specifications in question are more or less

stringent than the others, with respect to requirements," I&D Mem. at 62.  The "sale

observations were not shown to be linked to the products as imported into the United

States." *Id.* at 62.  Plaintiff does not point to any evidence that undermines these

conclusions.  Importantly, Plaintiff's proffered explanation of why it reported the

CONNUM and PRODCOD2U data differently does not explain why certain sales had

inconsistent and mutually exclusive specifications.  *See* CEP SVE, Ex. 17 at 61.[23]  In its

briefing and at oral argument, Plaintiff did not, and in fact could not, identify any record

evidence that would explain the inconsistent classifications, which would detract from

the agency's reasoning that the Spec C products were unverifiable.  *See* Oral Arg. at

1:44:03-1:49:42 (reflecting the time stamp from the recording).

The court also finds that Commerce's determination to apply AFA is in

accordance with law.  In its initial questionnaire, Commerce requested information on

the home and U.S. market sales for a complete sales reconciliation.  *See* Hyundai Steel

IQ at B-6—B-14, C4—C-11 (requesting information on product characteristics, product

specifications, quality, and yield strength and defining all terms).  Commerce requested

a narrative response if Hyundai Steel needed to clarify that its products were described

differently for the purposes of calculating an accurate dumping margin.  *Id.* at C-5 ("If

you add [product] characteristics not specified in the questionnaire, describe in the

narrative response why you believe that the Department should use this information to

define **identical** and **similar merchandise**.") (emphasis in original).  Plaintiff was

required to prepare an "accurate and complete record in response to questions plainly

asked by Commerce."  *Tung Mung Dev. Co., Ltd. v. United States*, 25 CIT 752, 788-89

(2001) (citing *Olympic Adhesives, Inc. v. United States*, 899 F.2d 1565, 1571-72 (Fed.

Cir. 1990)).  Plaintiff had the opportunity to explain any additional product characteristics

---

[23] *See supra* note 21.

or reporting inconsistencies in the narrative portion of Commerce's questionnaire, but failed to do so prior to verification, and, even then, failed to provide adequate explanations for its reporting.

With respect to home market sales, Plaintiff attempts to minimize the impact of its failure to report accurate CONNUMs by focusing on the volume of each specification sold.  It argues that "[t]hese products were of truly miniscule volumes, were not specifications typically sold, and as such, any reporting issues were minor and insignificant and did not justify Commerce in resorting to AFA."  Pl.'s Br. at 35; *see also id.* at 37; Pl.'s Reply at 19.[24]  However, the fact that the sales in question are a small percentage as compared to the total number of the home market sales is of no importance.  Although the number of sales in question may be small in comparison to the total number of home market sales, the quantity of products within those sales, which is unknown, could be significant and, if the U.S. sales to which they match are substantial, they could have a significant impact on the margin calculation.  *See* Def.-Int.'s Resp. at 26-27 (arguing that inaccurate and unverifiable reporting of CONNUMs "has a far-reaching impact on the U.S. sales, home market sales and cost databases, which would require the costs associated with the misreported product be assigned to the correct products, as well as other adjustments to the home market and U.S. sales.")

Plaintiff also asserts that its reporting errors were neither the result of inattentiveness or carelessness, nor "intentional" or "nefarious."  Pl.'s Reply at 19. However, Commerce's findings that Plaintiff reported inaccurate, inconsistent, or

---

[24] For example, Hyundai Steel states that for Spec D, Spec E, and Spec H, there were only [[     ]], [[        ]], and [[   ]] sale transactions, respectively, out of [[       ]] reported sales.  Pl.'s Br. at 35-36.

unverifiable CONNUMs, which findings are largely undisputed by Plaintiff, are supported

by substantial evidence.  As further detailed above, the record shows that Plaintiff was

unable to adequately explain these reporting errors.  Certainly, "[t]he best-of-one's-

ability standard 'does not require perfection and recognizes that mistakes sometimes

occur,' but 'it does not condone inattentiveness, carelessness, or inadequate record

keeping.'"  *Papierfabrik Aug. Koehler SE v. United States*, 843 F.3d 1373, 1379 (Fed.

Cir. 2016) (quoting *Nippon Steel*, 337 F.3d at 1382).  That Plaintiff's errors may not

have been intended is not relevant to Commerce's decision to use an adverse

inference.  *See Nippon Steel,* 337 F.3d at 1383 ("While intentional conduct, such as

deliberate concealment or inaccurate reporting, surely evinces a failure to cooperate,

the statute does not contain an intent element. 'Inadequate inquiries' may suffice. The

statutory trigger for Commerce's consideration of an adverse inference is simply a

failure to cooperate to the best of respondent's ability, regardless of motivation or

intent.").

According to Plaintiff, Commerce was required to notify Plaintiff of any perceived

deficiencies or anomalies in the submission or take issue with its product code and

CONNUM methodology before resorting to AFA.  *See* Pl.'s Br. at 38; Pl.'s Reply at 18.

As previously noted, if Commerce determines that a respondent has not complied with a

request for information, it must promptly inform that respondent of the nature of the

deficiency and, to the extent practicable in light of statutory investigation time-limits,

provide that respondent "an opportunity to remedy or explain the deficiency."  19 U.S.C.

§ 1677m(d).  Here, Commerce discovered the deficiency for the first time at verification.

Even then, Commerce provided Plaintiff an opportunity to explain the deficiencies,

which Plaintiff was unable to do.  Consequently, Commerce complied with the

requirements of section 1677m(d).

> **C.      Commerce's AFA Adjustment with Respect to Hyundai Steel's U.S.
>            CONNUM was not Based on Substantial Evidence**

As partial AFA for the issues it identified in Hyundai Steel's U.S. sales (Spec C),

Commerce selected the highest calculated margin for any other reported U.S. sale of

Hyundai Steel.  I&D Mem. at 63.[25]  Plaintiff argues that the selected margin is

"aberrational and punitive," the sale that gave rise to this margin was itself

aberrational,[26] and Commerce violated 19 U.S.C. § 1677m(e) in selecting this margin.

Pl.'s Br. at 38-39; Pl.'s Reply at 20; *see also* Pl.'s Br. at 39 (arguing that Commerce was

obligated to use the reported data because "the data for these sales was not so

incomplete that they could not serve as a reliable basis for use in the margin

calculations").

"The purpose of the adverse facts statute is 'to provide respondents with an

incentive to cooperate' with Commerce's investigation, not to impose punitive

damages."  *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir.

2012) (quoting *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216

F.3d 1027, 1032 (Fed. Cir. 2000)).  Commerce "may employ adverse inferences about

the missing information to ensure that the party does not obtain a more favorable result

by failing to cooperate than if it had cooperated fully."  Statement of Administrative

---

[25] The highest calculated margin for Hyundai Steel's other U.S. sales was [[      ]] percent.  Final Sales Calculation Mem. at 6.
[26] Plaintiff argues that the sale was aberrational due to it being a single sale of a [[ ]] product.   Pl.'s Br. at 38-39 (citing Hyundai Steel Suppl. §§ B and C Resp. at 18-19; Hyundai Steel's Ministerial Error Comments at 13-14); *see also* Hyundai Steel Suppl. §§ B and C Resp., Ex. S-24 (sales documentation for the sale in question).

Action accompanying the Uruguay Round Agreements Act ("SAA"), H.R. Rep. No. 103–316, vol. 1, at 870 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4199.[27]  "[I]n selecting a reasonably adverse facts-available rate, Commerce must balance the statutory objectives of finding an accurate dumping margin and inducing compliance, rather than creating an overly punitive result."  *Timken Co. v. United States*, 354 F.3d 1334, 1345 (Fed. Cir. 2004).

When Commerce applies AFA, it may use information from the petition, a final determination in the investigation, any previous review, or any other information on the record.  *See* 19 U.S.C. § 1677e(b).  When Commerce relies on information obtained in the course of an investigation or review, it is not required to corroborate that information.  *See* 19 U.S.C. § 1677e(c); *Nan Ya Plastics*, 810 F.3d at 1348.  Section 502 of the TPEA recently amended 19 U.S.C. § 1677e to significantly reduce the administrative burden for selecting an AFA rate, making it clear that Commerce does not have to corroborate an antidumping duty rate that has been applied in the same segment of the proceeding or select an antidumping duty margin that reflects the "commercial reality" of the interested party.

Here, the AFA margin applied to these Spec C sales was based on the highest calculated margin for Hyundai Steel's other U.S. sales and, when applied to those sales, caused a margin increase of less than five points.  *See* Final Sales Calculation

---

[27] The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

Mem. at 1.[28]   Consistent with 19 U.S.C. § 1677e(b)(2)(D), Commerce may use as AFA

the highest transaction-specific margin on the record of the segment of the proceeding.

*See Nan Ya Plastics*, 810 F.3d at 1350.   To be clear, while Congress established a

corroboration requirement when using secondary information, by contrast, Congress did

not require Commerce to select adverse facts that "reflect a certain amount of sales,

yield a particular margin, fall within a continuum according to the application of particular

statistical methods, or align with standards articulated in other statutes and regulations."

*Id.* at 1347.

Plaintiff recognizes the purpose behind the recent amendments to § 1677e, but

maintains that the amendment does not give the agency to freedom to select "any

figure, regardless of its source and reasonableness, as an AFA margin or AFA record

plug."   Pl.'s Br. at 39.   At oral argument, Plaintiff stated that Commerce's selection of the

AFA rate in this case was unreasonable because the sale was not representative of

Hyundai Steel's sales.   Oral Arg. at 2:02:42-2:03:35.   Put another way, Hyundai Steel

argues that the sale upon which the AFA margin is based was aberrational.   *See* Pl.'s

Br. at 38-39.   While the Defendant disputes that the sale was "aberrational," the

Defendant admits that "it was invoiced differently than other U.S. sales because of the

nature of the product."   Gov.'s Resp. at 39 (citation omitted).   The Defendant goes on to

assert, without any record analysis to support it, that nothing in the record supports a

---

[28] The weighted-average margin before application of AFA was 29.69 percent, whereas the final weighted-average margin after the application of AFA was 34.33 percent; thus, the resulting margin difference due to the application of the [[    ]] percent AFA margin was 4.64 percent.   Final Sales Calculation Mem. at 1.

finding that the prices, costs, or expenses are aberrational compared to other U.S. sales.

A sale is aberrational when it deviates from the usual or normal way or may be regarded as atypical.  *See* Webster's Third New Int'l Dictionary of the English Language Unabridged (2002) at 3 (defining "aberration" as an "act of wandering away or going astray: deviation from . . . a normal type.")  Defendant acknowledges that the sale in question was invoiced differently because of the nature of the product, recognizing that it was atypical of Hyundai Steel's U.S. sales.  As such, the sale was aberrational and an inappropriate basis for the selection of an AFA margin.

The agency has broad discretion to select a margin to use as adverse facts available, particularly following the amendments to 19 U.S.C. § 1677e pursuant to the TPEA and when using primary information as AFA; however, that discretion is not unbounded.  While the margin need not reflect any alleged "commercial reality" or otherwise seek to estimate what the margin might otherwise have been, 19 U.S.C. § 1677e(d)(3), an AFA margin is unsupported by substantial evidence when it is based on an aberrational transaction.  This is not to impose a representational test on the selected margin, but simply to exclude those transactions (regardless of the resulting margin) that are true outliers based on the nature of the transaction or product involved.

The court will remand Commerce's selection of the AFA margin for Hyundai Steel's Spec C sales so that Commerce may select a margin not based on an aberrational sale.

### III.   Commerce's Denial of a CEP Offset

Plaintiff's final challenge to the *Final Determination* is to Commerce's decision to deny Hyundai Steel a CEP offset.  Pl.'s Br. at 40-45.  Plaintiff asserts that Commerce's denial of a CEP offset was unsupported by substantial evidence because Plaintiff's home market level of trade is more advanced than its U.S. level of trade.  Pl.'s Br. at 40.  According to Plaintiff, the record established that Hyundai Steel performed significantly greater selling activities in selling to its unaffiliated home market customers than to its U.S. affiliates in all four categories of activities that Commerce examines: (1) sales and marketing; (2) freight and delivery; (3) inventory maintenance and warehousing; and (4) warranty and technical support.  Pl.'s Br. at 41-43; Pl.'s Reply at 21.  Plaintiff further argues that Commerce unjustifiably denied Plaintiff a CEP offset, when it previously had granted a CEP offset in other cases with similar facts.  Pl.'s Br. at 44-45.

Commerce's determination is unsupported by substantial evidence.  Here, Commerce examined the four selling function categories it typically considers for a CEP offset analysis: (1) sales and marketing; (2) freight and delivery services; (3) inventory maintenance and warehousing; and (4) warranty and technical support.  I&D Mem. at 87; *see also* Prelim. I&D Mem. at 19 & n.75 (citing *Certain Orange Juice from Brazil*, 75 Fed. Reg. 50,999 (Dep't Commerce Aug. 18, 2010) (final results of antidumping duty admin. review and notice of intent not to revoke antidumping duty order in part), and accompanying Issues and Decision Mem., A-351-840 (Aug. 11, 2010) at cmt. 7).  Commerce noted that Hyundai Steel had reported home market sales through "two channels of distribution (i.e., direct shipments to end-users or distributors)."  I&D Mem. at 87.  Based on its analysis of the selling function categories, Commerce found that

Hyundai Steel performed sales and marketing, freight and delivery services, and warranty and technical support for its reported sales to affiliated and unaffiliated customers in the home market.  *Id.*  Commerce thus determined that Hyundai Steel performed the same selling functions at the same "relative level of intensity" for all of its home market sales.  *Id.*

With respect to the U.S. market, Commerce noted that Hyundai Steel had reported making those sales through three channels of distribution: EP sales through unaffiliated Korean distributors (Channel 1); CEP sales through its affiliates HSA, Hyundai Corporation, and HCUSA to unaffiliated processors (Channel 2); and CEP sales through its affiliate HSA to unaffiliated processors and affiliated processors (Channel 3).  *Id.* at 87 & nn.462-463 (citing Hyundai Steel's § A Resp. at A-21—A-25 & Ex. A-13; Hyundai Steel's Suppl. § A Resp. at 10 & Ex. SA-13).  Commerce determined that Hyundai Steel performed the same selling functions at the same relative level of intensity for its sales through Channels 1 and 3.  *Id.* at 88.  Moreover, Commerce determined that Channel 1 and Channel 3 sales were made at the same level of trade as the home market sales; thus, no level of trade adjustment, and no CEP offset, was warranted.  *Id.* at 88-89.  With respect to Channel 2, Commerce found that Hyundai Steel "provided notably fewer selling functions . . . than it did in Channels 1 and 3," and determined "Channel 2 to be at another, less advanced [level of trade] than Channels 1 and 3."  *Id.* at 88.  Notwithstanding its findings that Channels 1 and 3 were at the same level of trade as the home market sales, and that Channel 2 sales were at a less advanced level of trade than Channels 1 and 3, Commerce inexplicably concluded that:

> Hyundai Steel's home market sales during the POI were made at a same [level of trade] as its CEP sales. Also, Hyundai Steel's home market [level

> of trade] is not at a more advanced stage of distribution than its CEP [level
> of trade] through Channels 1, 2, and 3, and thus, no [level of trade]
> adjustment is possible. Consequently, there is no basis for considering a
> CEP offset with respect to Hyundai Steel. Accordingly, we have not
> granted a CEP offset, pursuant to section [19 U.S.C. 1677b(a)(7)(B)].

*Id.* at 88.  In short, Commerce's explicit finding with respect to U.S. Channel 2 does not

support this conclusion and cannot be reconciled with it.  In the absence of substantial

evidence, this conclusion must be remanded.  *See Bowman Transp., Inc. v. Ark.-Best

Freight System, Inc.*, 419 U.S. 281, 285–86 (1974) ("The agency must articulate a

rational connection between the facts found and the choice made.") (internal quotation

marks and citation omitted).

## CONCLUSION

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's Final Determination is remanded to Commerce so

that it may reconsider or further explain its application of AFA for domestic inland freight

expenses on transactions that incurred no foreign inland freight and on transactions for

which domestic inland freight was provided by an unaffiliated freight provider; and it is

further

**ORDERED** that Commerce's Final Determination is remanded to Commerce so

that it may select an AFA margin to use for Hyundai Steel's Spec C sales that is not

based on an aberrational sale; and it is further

**ORDERED** that Commerce's Final Determination is remanded to Commerce so

that it may reconsider its denial of a CEP offset for Hyundai Steel; and it is further

**ORDERED** that Commerce shall reconsider whether to correct its ministerial errors that previously had no effect on Hyundai Steel's weighted-average dumping margin; and it is further

**ORDERED** that Commerce shall file its remand results on or before September 26, 2018; and it is further

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule 56.2(h); and it is further

**ORDERED** that any comments or responsive comments must not exceed 5,000 words; and it is further

**ORDERED** that Commerce's Final Determination in all other respects is sustained.

/s/      Mark A. Barnett
Judge

Dated: June 28, 2018
       New York, New York